[No. 1800.]

THE STATE OF NEVADA, EX REL. JOHN HOLLEY AND WILLIAM M. HOAGLAND, RELATORS, v. H. BOERLIN, BEN ROSENTHAL, AND HENRY F. SPENKER, AS THE BOARD OF COUNTY COMMISSIONERS OF ESMERALDA COUNTY, STATE OF NEVADA, RESPONDENTS.

1. COUNTIES—MANDAMUS TO CORRECT ASSESSMENT—WHEN IMPROPER REMEDY—COUNTY COMMISSIONERS—DISCRETION. Under the act of March 19, 1891, p. 189, c. 100, as amended by Stats. 1893, p. 119, c. 113 (Comp. Laws, 1232), providing that if, after equalization of taxes, it shall appear that the levy by the commissioners of any county is in excess of the county's requirements, the commissioners must meet and reduce the rate to such sum as they deem sufficient, mandamus lies to compel commissioners to consider a petition to reduce a tax levy, but not to control exercise of their discretion in making a levy with the limitations prescribed by statute, where some tax must be levied.

2. COUNTIES—COUNTY COMMISSIONERS—POWERS. Boards of County Commissioners are inferior tribunals of special and limited jurisdiction, and can only exercise such powers as are specially granted, and a mode of exercising their powers prescribed by law is exclusive.

3. COUNTIES—WHEN IMPROPER REMEDY—TAXATION—COUNTY COMMISSIONERS. Mandamus does not lie to compel county commissioners to meet and abate a special tax levy for the courthouse bond fund created by special act of February 28, 1907 (Stats. 1907, p. 57, c. 30), where they have met and denied a petition to abate, though they have exceeded their powers.

4. MANDAMUS—WHEN IMPROPER REMEDY—ADEQUATE REMEDY AT LAW. Under Comp. Laws, 3543, mandamus will not lie where there is a plain, speedy, and adequate remedy at law.

5. MANDAMUS—RIGHT TO REMEDY—MATTER TO BE SHOWN. Mandamus will not lie unless a clear legal right to the remedy is shown.

TALBOT, C. J., dissenting.

ORIGINAL PROCEEDING. Mandamus by the State of Nevada, on the relation of John Holley and another, against H. Boerlin, et al., County Commissioners of Esmeralda County, Nevada. **Dismissed.**

The facts sufficiently appear in the opinion.

C. O. Whittemore and Rufus C. Thayer, for Relators.

William H. Bryant, amicus curiæ.

Mack & Green, for Respondents:

I. Municipal corporations may invest funds until needed for municipal use. (Foot v. Salem, 14 Allen, 87; Spaulding

v. *Arnold*, 6 N. Y. Supp. 336; *State* v. *Bowers*, 26 Oh. Cir. Ct. 326, affirmed 70 Ohio St. 423, 72 N. E. 1155; *New York* v. *Nat. Broadway Bank*, 10 N. Y. Supp. 555, affirmed 126 N. Y. 665, 27 N. E. 555.) A statute providing for a sinking fund in the absence of any express provisions to the contrary authorizes the proper investment of that fund. (*Elser* v. *Fort Worth*, 27 S. W. 739.)

By the Court, SWEENEY, J.:

This is an original proceeding in *mandamus* in behalf of the relators, taxpayers of Esmeralda County, to require respondents to meet in their official capacity as the Board of County Commissioners of Esmeralda County and reduce the tax levy for said county made in March, 1908, for general county purposes, and to abate the special tax levy of forty-five cents upon each one hundred dollars of taxable property for the "Courthouse Bond Fund," created under special act of the legislature of February 28, 1907 (Stats. 1907, p. 57, c. 30).

Upon the return of the alternative writ, respondents by their counsel interposed a demurrer to the petition and writ, a motion to strike certain portions of the petition, and, subject thereto, an answer to the petition and writ. The several questions raised by these pleadings, in so far as they are required to be determined, will be considered without reference to the manner in which they are raised. It is clear that the writ should not issue requiring respondents to meet and consider a reduction of the levy fixed for county purposes at one dollar and thirty-five cents upon each one hundred dollars of valuation of property subject to taxation. Petitioners base their claim for a reduction of this levy upon the provisions of an act of the legislature entitled "An act in relation to levying and assessing taxes for state and county purposes," approved March 19, 1891 (Stats. 1891, p. 189, c. 100), as amended in 1893. (Stats. 1893, p. 119, c. 113; Comp. Laws, 1232.) This act provides "that if, after equalization of taxes in the several counties of this state, it shall appear that the levy previously made by the board of county commissioners of any county in this state for county purposes will result in collection of a revenue, either in

excess or a deficiency of the requirements of such county for the current year, then and in such event, the board of county commissioners shall have the power, and it is hereby made the duty of such board of county commissioners, to immediately meet and either reduce or raise the rate of taxation, so previously levied, to such a sum as such board in its judgment may consider sufficient to insure the collection of such an amount of revenue as will answer all the requirements of such county for such current year."

Subsequent to the equalization of the assessment roll of Esmeralda County, relators, together with other taxpayers, petitioned respondents to reduce the levy for county purposes, and to abate entirely the special levy for the courthouse bond fund. These petitions were acted upon by respondents, and denied. It was conceded by counsel for petitioners upon the hearing that if the levy made in March, 1908, was for "the next ensuing fiscal year" of 1909 (see Stats. 1903, p. 108, c. 78), it was not excessive, and also it was conceded, under their contention that the levy was for the current fiscal year of 1908, that some levy was necessary. We need not enter upon a consideration of the contention that the tax rate for county purposes must be for the current year 1908; because, where it is admitted as in this proceeding that some tax is required to be levied, the amount of such levy within the limitations prescribed by statute being a matter in the discretion of the board of county commissioners, *mandamus* will not issue to control such discretion. The most that this court can do in a proceeding of this character would be to require the respondent board to meet and consider the question of a reduction. This they have already done. They have exercised their discretion as to whether the levy ought to be reduced, and determined that it should not be. Their discretion in this regard cannot be interfered with by writ of *mandamus.* We come now to consider whether or not *mandamus* will lie to abate the levy of forty-five cents for the courthouse bond fund.

It is well settled that boards of county commissioners are inferior tribunals of special and limited jurisdiction, and that they can only exercise such powers as are especially granted,

and that, when the law prescribes a mode which they must pursue in the exercise of these powers, it excludes all other modes of procedure. (*State* v. *C. P. R. R. Co.*, 9 Nev. 79; *Godchaux* v. *Carpenter*, 19 Nev. 415; *Sadler* v. *Eureka Co.*, 15 Nev. 39; *State* v. *Washoe Co.*, 6 Nev. 104.) As to the wisdom, policy, and expediency of the law, these are matters for the people of the state in legislature assembled to determine. An executive office should execute the law as it is made. It is not for any board of county commissioners to substitute their judgment for that of the legislature as to what is best for the county, where a statute expressly defines what shall be done; and while in the present case, even conceding for the sake of argument that from a business standpoint the commissioners acted for the best interests of the county, yet it is clear that they violated the law both in 1907 and 1908 in imposing a larger tax than authorized by law for the courthouse building, and in not following the mode provided by law for the disposition of the bonds for that purpose. But as to their violation of the law in not carrying out the said act of the legislature referred to, as I view the case, this is not a proper proceeding to determine the matters attempted to be remedied in the case now before us.

In the light of the law of 1907, and the pleadings and evidence now before the court in this proceeding, it is clear that the board of county commissioners had the authority and jurisdiction to make some tax levy for the payment of the courthouse for the year 1908, and that the board of county commissioners were petitioned to hear and determine the alleged grievances of the relators; that they granted a hearing to the relators, and, after hearing and weighing the objections made to the forty-five-cent levy, they acted upon the matter and denied the petition. Whether the tax is totally void or whether it is an excessive tax, so long as the county commissioners have met and exercised their discretion and judgment, and refused the application of petitioners, it is immaterial so far as the present proceedings are concerned, because *mandamus* will not lie to review, regulate, revise, or annul the official discretion or judgment of the board of county commissioners after they have once heard, considered, and finally exercised their discretion and judg-

ment, no matter whether said exercised discretion and judgment is erroneous or excessive. (*State* v. *Commissioners*, 8 Nev. 309; *Floral Springs* v. *Rives*, 14 Nev. 431; *Treadway* v. *Wright*, 4 Nev. 119; *Hoole* v. *Kinkead*, 16 Nev. 217; *Humboldt Co.* v. *Churchill Co.*, 6 Nev. 30; *Mau* v. *Liddle*, 15 Nev. 271; *Hardin* v. *Guthrie*, 26 Nev. 246; *Young* v. *Lane*, 43 Neb. 812, 62 N. W. 202; *East St. Louis* v. *U. S.*, 110 U. S. 321, 4 Sup. Ct. 21, 28 L. Ed. 162; *City of Cleveland* v. *U. S.*, 111 Fed. 341, 49 C. C. A. 383; *City of Sherman* v. *Langham*, 92 Tex. 13, 40 S. W. 140, 42 S. W. 961, 39 L. R. A. 258; *Humboldt Co.* v. *Lander Co.*, 22 Nev. 71; *State* v. *Murphy*, 19 Nev. 89; 19 Am. & Eng. Ency. Law, 735.)

*Mandamus* will not lie where there is a plain, speedy, and adequate remedy at law. (*Gleeson* v. *Jumbo Ex. 'M. Co.*, 30 Nev. 192; Comp. Laws, 3543; *State* v. *Guerrero*, 12 Nev. 107; *Mayberry* v. *Bowker*, 14 Nev. 336; *State* v. *Commissioners*, 22 Nev. 263.)

Nor will *mandamus* lie unless a clear legal right to the remedy is shown. (*State* v. *Noyes*, 25 Nev. 49; *State* v. *Stoddard*, 25 Nev. 464; *State* v. *LaGrave*, 22 Nev. 417; *State* v. *Meder*, 22 Nev. 264; 19 Am. & Eng. Ency. Law, 725; 19 Cyc. 151.)

Though this proceeding consumed six days in submitting it to the court, and able and exhaustive arguments were made by counsel on both sides, as well as by counsel *amicus curiæ*, and though this court has industriously worked since the submission of the cause in reviewing the various authorities cited and found, yet the fact remains that neither counsel have called our attention to, nor has the court been able to find, a single authority directly in point which holds that *mandamus* will lie to correct the wrong sought to be remedied by relators.

Being of the opinion that *mandamus* is not the proper remedy in the present case, for the foregoing reasons the proceedings herein are dismissed. It is further ordered that the respective parties herein pay their own costs.

NORCROSS, J., concurring:

I concur in the judgment dismissing the proceedings. There is no question in my opinion that the writ will not

lie to compel respondents to again meet and consider a reduction of the levy for general county purposes; they having already acted and the matter being within their discretion. With regard to the special levy of forty-five cents for the courthouse bond fund, which relators claim to be entirely void, I am inclined to the opinion that if the court could agree with relator's contention in this respect, and the proceedings had been instituted seasonably, that the writ would lie. If, as contended by petitioner's counsel, in which contention I am in accord, no necessity existed in March, 1908, for any levy for this fund, the levy could have been attacked at any time thereafter. At the time this action was instituted the assessment roll had been delivered to the county auditor and by him to the county treasurer. Taxes were due and payable before this case was submitted, and will become delinquent after the 7th of the present month, unless one-half thereof be paid on or before that date. Besides, it appears that a portion of the tax under this levy has already been collected from personal property and from bullion tax. Our attention has not been called to an authority directly in point, nor have we been able to find one. The question of the remedy is therefore a very serious and doubtful one, even though we were able to agree entirely upon the law of the case.

Were I able to agree with the learned Chief Justice that the levy was only excessive, a small portion thereof being still necessary to be laid to meet demands on said fund, I would yet be unable to agree with him that the writ will lie to compel respondents to meet and make a reduction of said levy. If they have any discretion at all to make a levy in the premises, even though that levy is unnecessarily high, *mandamus* will not lie to compel them to again exercise their discretion. As the writ of *mandamus* will only lie to compel the exercise of a duty specially enjoined by law and where the petitioners are clearly entitled to the relief demanded and have no other adequate remedy at law, and will not issue in a doubtful case, I am unable to see how the writ could appropriately issue in this case. The right to the writ is not only not apparent, but it is of very doubtful application.

While I am of the opinion that the writ ought to be dis-

missed, nevertheless I believe that the board of county commissioners may yet have power to relieve the taxpayers from a heavy burden of tax on account of this levy due to a misconception of the law upon the part of the board.

Whether or not the levy, made in 1907 for the courthouse bond fund, raised an amount of money sufficient to pay all the demands now existing against said fund, nevertheless there can, I think, be no question that bonds Nos. 1 to 25, inclusive, deposited in the interest and sinking fund of the act of 1895, are not outstanding obligations against the courthouse bond fund created under the act of 1907. The bonds in question were never issued and sold as the act provided, and the board of county commissioners had no power to dispose of them in any other manner than as the act provided. The act of 1895 creating the interest and sinking fund provided in terms how the moneys in that fund should be disposed of, and precluded disposition in any other manner than as the statute provided. This act by section 5, after providing for a tax levy to pay the principal and the interest on bonds issued in pursuance of the act, further provided: "The money raised from such tax shall be placed in the 'Interest and Sinking Fund' of said county, and shall so far as necessary be applied to the payment of the semi-annual interest on said bonds, at the times herein stated. The overplus shall annually be placed in the general fund of said county, to be replaced in said 'Interest and Sinking Fund' when needed to pay the principal when due on said bonds. * * *" (Stats. 1895, p. 33, c. 33.)

The plain provisions of this statute authorize the transfer of surplus moneys in this fund to the general fund of the county to be returned therefrom when necessity requires to pay outstanding bonds. It is shown that there is now in this fund more money than is necessary to meet the interest on outstanding bonds by several thousand dollars. Besides, there is a five-cent levy for said fund this year which, it is estimated, will produce about $6,000. This fund is therefore overflowing in so far as present requirements are concerned. As I view it, the money taken from this fund and placed in the courthouse building fund was in legal effect placed in the

general fund of the county, and therefore the general fund of the county is charged with its repayment, as the statute provides, "when needed to pay the principal when due on said bonds." The so-called courthouse building fund is but a part of the general fund for the following reasons: It is a fund not authorized by law, and the board of commissioners have no powers to legislate a fund. It is simply a fund created for convenience. The statutes provide the funds into which the commissioners may apportion moneys, and, if they create a fund for their own convenience in the management of the fiscal affairs of the county, such fund has no standing in law. (Comp. Laws, 1224, 2111, 2137.)

The construction of courthouses, jails, and other needful county buildings is within the general powers of the board of county commissioners. The expense for such construction is a charge against the general fund of the county. When respondents created the courthouse building fund, they simply segregated a portion of the general fund for courthouse purposes. No levy is authorized by law for such fund, nor has any ever been made or attempted. Therefore, in my judgment, the money taken by respondents from the interest and sinking fund, and placed in the general fund through the so-called courthouse building fund, was justified in law, and no necessity is now existing for its repayment. It follows that the placing of the twenty-five bonds in said fund for "security" or otherwise was without legal effect, and no obligation exists by reason thereof to pay the same, or to reimburse said fund by a levy for the courthouse bond fund. As the principal part of the levy of forty-five cents was to pay $20,000 of these bonds and interest thereon, it clearly appears that the major portion of such levy was due to this mistake in law as to the amount necessary to be levied.

If the respondent board should meet and vacate or reduce their levy and serve a certified copy of their order in the premises upon the auditor and treasurer of the county, I am of the opinion it would be the duty of the said auditor and treasurer to respect such order. (Comp. Laws, 1223; *State ex rel. Ross* v. *Headlee*, 22 Wash. 127, 60 Pac. 126.)

TALBOT, C. J., dissenting:

Relators ask for a writ of mandate requiring the Board of County Commissioners of Esmeralda County to meet and abate a levy of forty-five cents made by them in March, 1908, for the courthouse bond fund under the act of February 28, 1907, p. 57, c. 30, authorizing the board to issue bonds for the erection and furnishing of county buildings in Goldfield following the removal of the county-seat to that place. It is also demanded that the board be required to reduce the levy of one dollar and thirty-five cents for county purposes to such a sum as will produce a revenue sufficient to pay the expenses of the county remaining unpaid for the present year. A demurrer and motion to strike out filed by respondents were overruled subject to further advisement, and an answer was filed, and the application proceeded to hearing upon its merits. Any parts of the petition attacked by the motion which are immaterial have been disregarded, and the effect of the demurrer may be considered as settled by the decision on the merits.

The evidence and extended argument, which occupied several days, related principally to the forty-five-cent levy for the courthouse bond fund. Relators' contentions in this regard are based on the allegations in their application, stating substantially that on or about the 8th day of October, 1908, a certain petition different from the one attacking the levy of one dollar and thirty-five cents for various county purposes was filed with the board on behalf of taxpayers, directing attention to the levy of forty-five cents on each one hundred dollars valuation of taxable property in the county, to produce revenues to pay interest, and provide for the redemption of courthouse bonds under the act of February 28, 1907, authorizing the Board of County Commissioners of Esmeralda County to issue bonds for the purpose of creating a fund for the erection and furnishing of county buildings in the Town of Goldfield, in which petition to the board their attention was invited to the records of the clerk of the county, from which it was asserted that it appeared that none of said bonds were sold in the year 1907, and that

the first sale thereof occurred on March 5, 1908, on which date three of them, due in 1911, were sold, and since that date ten of them, due in 1910, ten due in 1912, and ten due in 1913, have been sold, making a total of thirty-three bonds of a value of $1,000 each outstanding, and that the remaining bonds are unsold in the possession of the county treasurer. By that petition to the board their attention was also invited to the levy of forty cents on each one hundred dollars in the year 1907 to pay interest and provide for the redemption of said bonds, which levy produced a revenue in the year 1907 sufficient to pay all the bonds which had been issued and sold, and the interest which would accrue thereon, until the collection of taxes in the year 1909. By reason of these facts alleged in that petition, the board were asked to abate the levy of forty-five cents as fixed for 1908 for the purpose of producing a revenue to provide a sinking fund for the redemption of these bonds, and that the rate of taxation as fixed by the board be reduced in that amount. That petition was denied by resolution of the board.

As held by a long line of decisions in this and other courts, boards of county commissioners have only limited jurisdiction, and have only such powers as are conferred upon them by legislative enactment. There are general statutes authorizing them to provide a courthouse and to make levies for this and other purposes. In this connection we are to remember that, so far as this forty-five-cent levy is concerned, it is not claimed or purported to be made for any purpose, but to meet the demands of the courthouse bond fund established by the statute mentioned. As the levy was made under that act, the power of the board to make the levy must be limited by its terms, and restricted to the powers it confers. The question before us is not whether the board under some other grant of power or limitation could have made the levy of forty-five cents or at any other rate for the courthouse building fund or for the general fund for the payment therefrom for the erection and furnishing of the courthouse and county buildings. Turning to the act (Stats. 1907, p. 57, c. 30), which is the only authority given the board of county commissioners to make the levy assailed, section 1 authorizes the

board to prepare and issue bonds for an amount not exceed-
ing the sum of $100,000, exclusive of interest, for the pur-
pose of providing funds and obtaining premises and for the
erection and furnishing of a courthouse and jail and other
necessary buildings in the Town of Goldfield.   Section 5 pro-
vides that each bond shall be in the sum of $1,000, and that
the interest thereon shall not exceed seven per cent per
annum, payable annually on the first Monday of January in
each year, and that in no case shall any of such bonds run
for a longer period than ten years.

Sections 6, 7, and 8 are as follows:

"SEC. 6.   For the purpose of creating a fund for the pay-
ment of the bonds authorized by this act and the interest
thereon, the Board of County Commissioners of Esmeralda
County are hereby authorized and required to levy and collect
annually a special tax on the assessed value of all property,
both real and personal, including proceeds of mines within
the boundaries of said Esmeralda County, until such bonds
and interest thereon have been fully paid, sufficient to pay
the interest on said bonds and pay and retire ten of said
bonds annually after the first Monday in January, 1908.
Such tax shall be levied and collected, in the same manner
and at the same time as other taxes are assessed and collected,
and the proceeds thereon shall be kept by the county treas-
urer in a special fund to be known as the Courthouse Bond
Fund.

"SEC. 7.   It shall be obligatory on said county and its
proper officers to fully pay the interest on said bonds annu-
ally, and to fully pay and retire ten of said bonds on the
first Monday of January, 1908, beginning with the first
number thereof, and so on consecutively, and on the first
Monday of January of each year thereafter, until said bonds
and the interest thereon are fully paid, canceled, and retired,
to pay and retire ten of said bonds in such manner.

"SEC. 8.   Whenever the bonds and interest provided for
in this act shall have been fully paid the tax authorized by
this act shall cease, and all moneys remaining in said bond
fund shall by order of the board of county commissioners be
transferred to the general fund of said county."

Clearly the board were authorized to issue bonds not exced-
ing $100,000, $10,000 of which could be made payable annu-
ally for ten years, and could levy an amount of taxes sufficient
to pay the interest, and the principal of not more than ten
of these bonds annually. · Under a fair construction of the
sections quoted, the board were authorized to provide for
such taxes yearly as would meet the payment of the interest
and principal on all the bonds as they became due, but they
were not empowered to include in this year's revenues money
to be held in the treasury to meet the payment of interest or
bonds maturing after the present and succeeding year and after
the expiration of the time which would naturally be met by
future levies. To the end that there may be no default in
meeting the obligations of the county and no unnecessary
burdens cast upon the taxpayer in excess of these demands,
it is essential to determine the amount needed. Of the thirty-
three bonds sold none mature next year, and nothing is
required from this year's levy except to meet the interest on
these for less than one year at seven per cent, payable on the
first Monday of next January, and amounting to less than
$2,000, as three of them were sold on March 5, 1906, and the
others later. As it is estimated that only about sixty per
cent of the taxes on real estate are paid on the first install-
ment by the first Monday in December, it is necessary to
raise from this with what is collected from the net proceeds
of bullion and personal property enough to meet all the inter-
est coming due, as the second installment does not have to
be paid until June. This forty-five-cent levy would produce
according to the testimony of the deputy county treasurer
about $50,000 or fifteen times the amount, or, according to
members of the board of county commissioners, $30,000 or
ten times the sum, required. It appears from their testimony
that the board made this levy, not only for the purpose of
paying this interest, but with the intention of meeting the
interest and $20,000 of the principal on twenty of the twenty-
five bonds placed in the earlier sinking fund, ten of which
were believed to mature on the 1st of January, 1908, and ten
on the 1st. of January, 1909. This · leads us to consider

whether these latter bonds are an obligation requiring any levy or payment, at least during the present year.

Esmeralda County had previously incurred indebtedness for building courthouses at Aurora and later at Hawthorne, and in 1895 an act was passed by which new bonds were issued to refund the remainder of the former obligations, and of these $25,000 principal and interest at seven per cent, payable semi-annually, were last year and still are outstanding, and not one of them is payable until 1910, when $5,000 will mature, and a like amount will become due each five years thereafter. The value of the property in the county at the time they were issued was comparatively small, and the great increase since the discoveries at Goldfield and other places, and the building of railroads to the new mining towns, has so increased the valuation that last year there was a surplus in the sinking fund for the payment of these bonds of more than $25,000 after meeting all obligations then due against it. The levy of five cents this year for that fund, which is not assailed, will produce more than enough to pay the interest upon these bonds next year and the principal on the five maturing in 1910. The act of 1895 provided that the board of county commissioners might transfer any surplus from that fund, and, when necessary, might transfer from the general fund enough to pay the interest or bonds maturing. The board transferred $25,000 from the surplus in that fund to the courthouse building fund, or first to the general fund and then to the courthouse building fund, and the money was expended towards the erection of the courthouse at Goldfield. When this money was taken from the old sinking fund twenty-five of the bonds under the act of 1907 were placed therein, on the theory that they were either sold to this fund or would stand as security for the $25,000 so transferred. By this transaction it would seem that the board were anxious to protect and reimburse the fund and were acting substantially under the statute of 1895, whereby they were specifically authorized to transfer any surplus from that fund to the general fund, and the general statute authorizing them to take the money therefrom which was needed for building the court-

house. Whatever precaution may have been shown by so placing the twenty-five bonds, no necessity for including them in the transaction is apparent. Even if the depositing of these bonds in that fund in lieu of the $25,000 withdrawn amounted to a sale, as has been argued, still there is no need for the forty-five-cent levy, or any levy, this year, to meet the payment of principal or interest on them, for, if they were paid, and the money put into the sinking fund, it is not needed there to meet any present obligation against that fund, and under these circumstances the taxpayers ought not to be required to pay the money now when it will not be needed this year or next. Hence, upon no theory which has been advanced is there any present direct or indirect obligation to be paid out of the courthouse bond fund this year or next, excepting the interest on the thirty-three bonds sold and outstanding. It was quite proper for the board to make a levy which would yield the small amount necessary to meet this interest, but they were not authorized to include in that levy enough to pay this old sinking fund the interest and $20,000 of the principal of the twenty-five bonds, so placed in that fund, when the money was not needed there, although acting in good faith and under the belief that it ought to be returned to that fund through a levy made this year. The board were not warranted in levying upon the taxpayers the unnecessary burden of paying this $20,000 of principal, besides interest, into a fund upon which there was no demand for anything, excepting interest on thirty-three bonds sold, when the act creating that fund provides that any surplus in it may be transferred out and returned when needed. As the levy for this interest, which must be paid, was lumped with the other, which is not needed, and as the court will not direct or control the discretion of the board, nor substitute its own judgment, and as the proper levy to raise the amount to meet the interest payable next January on the thirty-three bonds sold has not been determined separately by the board so that it can be ascertained and paid, or so the remainder of the levy could be recovered back by suit on behalf of the taxpayers, if they paid under protest, and as the forty-five-cent levy under the testimony of the members of the board

is largely in excess of what they intended for the payment
of this interest, and would produce several times the amount
of any obligations required to be paid out of that fund until
after the receipt of next year's taxes, and as under section
1232, Compiled Laws, it becomes the duty of the board when
it appears after equalization that the levy will produce more
money than needed to reduce it, the board ought to be
directed to meet at once, or prior to the 7th day of Decem-
ber, 1908, the day upon which the taxes become delinquent,
and reduce the forty-five-cent levy for the courthouse bond
fund to such an amount as in their judgment will yield
enough by payment of the first installment of taxes and the
rate on the net proceeds of mines and personal property
above delinquencies to meet the interest amounting to less
than $2,000 coming due in January, 1909, on the bonds sold
and outstanding.

Although more money was collected under the forty-cent
levy last year for the courthouse bond fund than was con-
templated by the act of 1907 under the section authorizing
only the levy of an amount sufficient to meet the annual
interest and retire ten of the bonds, there was no fraud, and,
if not strictly in accordance with the statute, the transaction
was for the best interest of the taxpayers. Although the
board had power under the general statute authorizing them
to provide a courthouse to raise money through the general
fund, subject to any statutory limitations, more rapidly than
provided by the act of 1907, when acting under that statute
or making a levy for the fund established thereby, as they
were in making the forty-cent levy in 1907 and the forty-
five-cent levy this year, they were not authorized to fix a
rate that would return more money than in their discretion
would meet the interest and $10,000 of the principal of the
bonds annually, but having collected more last year without
protest, and having transferred it to the courthouse building
fund and expended it in the cost of construction without
objection, it cannot be obtained from the recipients who fur-
nished the material and labor, and justly it cannot be recov-
ered from any other individual or fund which derived no
benefit and retained no portion of the money. It has been

applied more directly to the purpose for which the act of 1907 was passed—the building of a courthouse—than if the board had followed the statute strictly and sold additional bonds to be paid from the levy, $10,000 payable in January this year and $10,000 next January. The taxpayers have saved the interest which would have been paid on the bonds if the money had gone to retire them instead of directly to meet the cost of construction, and, as they have received the ultimate benefit of the money in its expenditure for the very purpose intended by the statute creating the fund for which the levy was made, a similar result and payment for the courthouse was accomplished, and, not having objected at the time these things transpired, they ought to be estopped from taking advantage of the irregularities which were done for their benefit last year. In this connection it must be granted that, if any seasonable objection had been made to an excessive levy or improper transfer last year, the statute and will of the lawmaking power, the legislature, could not be overthrown by any contrary policy for raising money faster which the board or the court might consider more expedient or beneficial. If it be conceded that ordinarily and regardless of statute when money is transferred from a special fund to some other fund it is compulsory on the board to return it, this rule ought not to apply here, for it does not appear that any fund, except the courthouse building fund, has received or retained any benefit from the transfers, and it does appear that the money accomplished the same result in paying for the construction of the courthouse as if it had been used to redeem bonds in compliance with the act, and consequently no other fund is obligated to transfer money to the courthouse bond fund when it has received no benefit, and under the equitable conditions existing the latter fund and the courthouse building fund are too closely allied to demand a transfer. If it be deemed compulsory to return money taken from a fund, the money having been paid out is no longer in the courthouse building fund, and there is no levy made or authorized to replenish it. No levy for this purpose has been made through the general fund, which is owing $23,000 for courthouse furnish-

ings and apparently other indebtedness. The proceeds of the forty-cent levy of last year having been applied directly on the cost of the courthouse in lieu of the negotiation of bonds for money for the same purpose, leaving fewer bonds outstanding, the interest on those sold and the principal as they mature must be paid by levies against the taxpayers and in the same amount, whether directly to the courthouse bond fund or indirectly to some other fund, and then by transfer to the courthouse bond fund. The theory that the money derived from the forty-cent levy last year is presumed to be in that fund was a correct presumption upon the demurrer, but is no longer tenable since the filing of the answer denying it and the introduction of undisputed evidence showing it has been expended. To hold that no levy can be maintained for the courthouse bond fund until the money transferred from it to the courthouse building fund and the part transferred first to the general fund, and then to the courthouse building fund, has been returned, would mean that during all the years, until the thirty-three outstanding bonds have matured, the money to pay them and the interest would have to be raised indirectly by levies for some other fund and then transferred. If no levy can be made directly for the courthouse bond fund on the theory that it is a special fund, and that the money transferred from it must be returned in lieu of a levy to meet any obligations against it, the same rule ought to apply to the earlier sinking fund under the act of 1895 from which the $25,000 was transferred and used in building the courthouse, and thereby indirectly maintain the forty-five-cent levy for this year which is sought to be destroyed, and the greater part of which according to the testimony of members of the board was laid for the purpose of repaying $20,000 of the $25,000 transferred from the old sinking fund, and to take up twenty of the bonds placed therein stated to mature in January this year and January, 1909.

As the obligations of the county must be paid regardless of any transfers, payments, or irregular disposition of its funds by its officers or agents, and as the moneys collected from the forty-cent levy last year have been expended and are not available, if the forty-five-cent levy is abated, and

with the general fund now in debt, there is default in the payment of the interest or principal of the outstanding bonds, cannot the holders compel the board to make a levy for their payment through the courthouse bond fund under the act of 1907, which is the only one authorizing a levy for such payment, and, if so, had not the board the right to make such a levy without any compulsion, and ought not the court require a levy to that extent, when it would be compelled at the instance of the bondholders, and the abatement of the unneeded excess?

Section .2167 of the Compiled Laws, authorizing county commissioners "to transfer any surplus money which may be in any of the county funds, except the school fund, from one or more of said funds to another or others and to transfer the same back to the fund or funds from which said surplus money was taken, at such times and in such manner as in the judgment of the commissioners the best interests of the county may require," was evidently intended to allow the board full discretion in making such transfers as would be convenient and most beneficial for the interests of the county, but there is nothing in the section to support the dicta used in *State* v. *County Commissioners*, 17 Nev. 103, where it is stated that, although the statute permits such temporary transfers, it also requires a retransfer of any sum so taken. This construction would legislate words into the act which are not there. The board were simply authorized to make transfers or retransfers at such times and in such manner as in the judgment of the commissioners the best interests of the county may require. Naturally the drain during the year upon one fund may be less and upon another may be more than was estimated by the board at the time of making the levy early in the year, and it is an advantage to have the surplus in one fund shifted to meet a deficiency in another, but there is nothing in the act to imply and no good reason for holding that the board must in future years replace money taken from any regular fund. It is evidently the intention to leave the transfers and retransfers to their discretion and not to make retransfers compulsory, but there may be an exception or limitation as to special funds. It is not neces-

sary to determine this question here, nor whether ordinarily they are authorized to transfer money from a special fund or must retransfer it to such a fund, for the money from the forty-cent levy last year was expended in such a way as to be equivalent to the return to the courthouse bond fund and its payment therefrom for the redemption of bonds, which could have been sold and redeemed in lieu of paying the money directly for construction.

Numerous cases in this court are cited by respondents, which it is claimed in effect hold that a taxpayer cannot proceed by writ or other special proceeding of this nature, but should pay his taxes and bring suit to recover them back. It may be noted that these were cases relating only to the tax sought to be collected from the individual taxpayer, and not concerning the legality of a levy affecting every taxpayer in the county. True, some decisions hold that courts have no power in equity to restrain the collection of a tax. The proceeding here might be construed as statutory under section 447 of the practice act (Comp. Laws, 3542), which provides that the writ of *mandamus* may be issued to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law especially enjoins as a duty resulting from an office or trust, and under section 1232 of the Compiled Laws, which provides that, if after the equalization of taxes, it shall appear that the levy previously made by the board of county commissioners for county purposes will result in the collection of a revenue in excess of the requirements of the county for the current year, then the board shall have the power, and it is made their duty, to meet and reduce the rate to such a sum as the board in their judgment may consider sufficient to insure the collection of such an amount as will answer the requirements.

The taxpayers are entitled to have the board exercise their discretion in this regard and reduce the rate accordingly. No other board or officer is authorized to make such a reduction, and without it the proportion of the tax paid under protest which could be recovered by suit would be without proper determination. If this proportion resting in part in the discretion of the board could be otherwise determined

and the only remedy was by payment of the tax and suit to recover it, the expected results would be a multiplicity of suits, for every taxpayer in the county is affected. A reduction is within the relief asked by petitioners' demand for the abatement of the entire levy. To hold that the board cannot be required to reduce a levy which would take from the taxpayers about $50,000 this year, after collecting $45,000 from them last year, under an act which does not authorize the collection of more than enough annually to pay $10,000 principal and $2,310 interest, and which under existing conditions does not empower them to levy more than $3,000 this year, is equivalent to saying that their discretion is above that of the legislature. If they are free to raise ten or fifteen times the amount needed, or nearly $50,000 more than is necessary, and may set their opinion above the law as to the amount of the levy and the purpose for which it is required, may they not collect still more and enough to build a fifty-thousand-dollar mansion for each member of the board without being checked by the courts or having any relief given to the appealing taxpayers? As to the amount needed for bridges, roads, and for contingent and general county funds, the commissioners have wide discretion, but in regard to the amount due on bonds fixed by law and contract, or for salaries designated by statute, they have none, and they are authorized to make such a levy as will in their judgment produce only enough to meet the amount of these obligations as fixed by law. If they had made the forty-five-cent levy which would produce about $50,000 for the purpose of paying only the interest amounting to about $2,000 coming due against that fund, when they were aware that the forty-cent levy last year had brought in $45,000, they would have shown an abuse of discretion, or that they were acting beyond, and not according to, their discretion, and that they had fixed a rate that would yield many times more than the amount which in their judgment was needed, and consequently they were acting beyond their powers, because only authorized to make such a levy as they believed necessary to raise the amount of this interest. However, they did not act in that way, but made the levy excessive, because erroneously they believed

regarding a close question of law that the levy or most of it was necessary for the payment of the money taken from the old sinking fund. The court cannot interfere with the commissioners' discretion where they have any, and can only annul their action where they have none, or to the extent that they went beyond their discretion in levying for a purpose for which no levy or payment is required; and so far as they refused to reduce the levy to a rate which would meet all obligations against the fund created by statute which limited their authority. If this is not a case calling for a writ of mandate, it is hard to conceive of one; for, if the levy may be made fifteen times larger than necessary, it may be fifty times, and an excess of hundreds of thousands of dollars may be collected with impunity. If it is not entirely clear under the facts presented that petitioners are entitled to the writ directing the reduction of the levy, because of the new features in the case, any doubt in this respect, instead of being a ground for denial of its issuance, ought to be resolved in such a way as to extend justice and grant relief from a levy, which is so clearly excessive, burdensome, and unauthorized.

Why not separate the wheat from the chaff, and abate that portion which is unnecessary and unauthorized, and retain the remainder, and give unto Cæsar the things that are Cæsar's, to the bondholder all that is due him, and not exact from the taxpayer more than is needed. The board were authorized tö make such levy as in their judgment would return enough to pay what the law requires to be paid out of this year's taxes, which is only the interest mentioned. Having no legislative power, they had no further discretion to provide in that levy for what the law does not demand, or for the payment of the money transferred from the old sinking fund which the law does not require to be paid from the present levy, because the money is not needed. Their good faith and belief to the contrary could not alter the law. Now, that it is manifest from the testimony of the commissioners that the most of the levy was for a purpose which contrary to their supposition was not required by law, they ought to be directed to abate that portion, and to reduce the

rate so it will produce only enough revenue to meet the legal requirements against the fund.

·The case is exceptional and without a parallel, but it is not necessary to have precedents in order to extend to litigants the relief to which they are entitled under statutes or as a matter of justice. Taxpayers and others ought to be afforded such protection as the conditions and exigencies, new or old, demand. It may not be unusual to raise some small amount annually for building up sinking funds, but it is the law supported by many decisions that the taxpayer is not to be required to pay large sums to lie idle years in advance to meet future obligations. The act of 1895 having provided for the return when needed of surplus moneys taken from the sinking fund, and it appearing with the amount already in that fund, and the proceeds of the five-cent levy this year, the fund will have enough to meet all demands against it for years in advance, and the principal of all bonds that mature prior to 1915, and that there is no need to raise any money under the forty-five-cent levy or otherwise this year to repay any. part of the $25,000 taken from that fund, that the act of 1907 authorizes the board to levy such a tax as will pay the interest and not more than $10,000 of the principal annually; that the only obligations outstanding and maturing against the courthouse bond fund during this year or next is the interest amounting to less than $2,000 due in January on the bonds sold; that the forty-five-cent levy will produce about $50,000, when one yielding $3,000 is ample to meet the obligations maturing this year and next against the fund for which this levy was made, and that the taxpayers ought to be relieved from paying the large excess in this levy; that it is the duty of the board under section 1232 of the Compiled Laws to reduce the excessive levy to a rate which will produce the amount needed; that after petition and demand the commissioners have refused to make such deductions; that section 3542 of the Compiled Laws provides that the writ of *mandamus* may issue to any officer or board to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust, or station, and, it clearly appearing that there is no other plain, speedy, and adequate remedy at law,

a writ of mandate ought to issue ·out of this court directing respondents to meet immediately as the Board of County Commissioners of Esmeralda County, and as such board reduce the forty-five-cent levy made for the year 1908 for the courthouse bond fund· in that county to such a rate as in their judgment will yield from the payment of the first.installment of taxes and from the proceeds of mines and personal property such an amount only as will be necessary to pay the interest amounting to about $2,000 coming due in January, 1909, on the thirty-three bonds sold and outstanding against that fund.